## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSHUA STEFFENS, Derivatively on Behalf of Nominal Defendant ALLOVIR, INC., | ) ) ) | |
| | ) | Case No.  1:24-cv-11721 |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| DIANA M. BRAINARD, DEREK ADAMS, JEFFREY BORNSTEIN, MALCOLM BRENNER, DAVID HALLAL, MORANA JOVAN-EMBIRICOS, VIKAS SINHA, SHAWN TOMASELLO, and JUAN F. VERA, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ALLOVIR, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joshua Steffens ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant AlloVir, Inc. ("AlloVir" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts

1

and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding AlloVir, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of AlloVir against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between March 22, 2022 and December 21, 2023, inclusive (the "Relevant Period").

2.      AlloVir is a clinical-stage cell therapy company developing therapies to treat and prevent viral diseases. The Company's proprietary virus-specific T cell, or "VST", therapy platform allows the Company to generate off-the-shelf VSTs designed to restore immunity in patients with T cell deficiencies.

3.      The Company's lead product candidate, posoleucel (previously referred to as Viralym-M or ALVR105), is a therapy that targets six viruses: adenovirus, or AdV, BK virus, or BKV, cytomegalovirus, or CMV, Epstein-Barr virus, or EBV, human herpesvirus 6, or HHV-6 and JC virus. In March 2022, AlloVir initiated global phase 3 registrational studies of posoleucel for the prevention of life-threatening viral infections in high-risk, allogeneic hematopoietic cell transplant patients (the "posoleucel Phase 3 Studies").

4.      Throughout the Relevant Period, the Individual Defendants made or caused the Company to make statements touting the efficacy and clinical and/or commercial prospects of posoleucel.

5.      However, on December 22, 2023, AlloVir announced that it was discontinuing the posoleucel Phase 3 studies over efficacy concerns and stated that it would explore strategic alternatives for the Company. AlloVir announced that the decision followed separate, pre-planned Data Safety Monitoring Board, or DSMB, futility analyses that concluded the studies were unlikely to meet their primary endpoints.

6.      On this news, the price of AlloVir stock dropped 67.38%, or $1.57 per share, to close at $0.76 per share on December 22, 2023.

7.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, in that: (a) the posoleucel Phase 3 Studies were unlikely to meet their primary endpoints; (b) as a result, it was likely that the Company would ultimately discontinue the posoleucel Phase 3 studies; and (c) accordingly, AlloVir overstated the efficacy and clinical and/or commercial prospects of posoleucel. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

8.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

9.      As a result of the foregoing, a securities fraud class action was filed against the Company, Chief Executive Officer ("CEO") Diana M. Brainard ("Brainard"), and Chief Financial Officer ("CFO") Vikas Sinha ("Sinha") captioned *Zerbato v. AlloVir, Inc. et al*, Docket No. 1:24-cv-10152 (D. Mass. Jan 19, 2024) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

10.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

11.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of AlloVir's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant AlloVir is headquartered in this District, conducts business in this District, and several of the acts and omissions charged herein occurred in substantial part in this District.

**PARTIES**

*Plaintiff*

17.     Plaintiff is and has been a continuous shareholder of AlloVir common stock since April 2021.

*Nominal Defendant*

18.     Nominal Defendant AlloVir is incorporated under the laws of Delaware, with its principal executive offices located in Waltham, Massachusetts. AlloVir's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "ALVR."

*Individual Defendants*

19.     Defendant Brainard has served as the Company's CEO since May 2021 and as a member of the Board since July 2020. As set forth in the proxy statement filed by AlloVir with the SEC on April 23, 2024 (the "2024 Proxy"), Brainard received $6,056,943 in compensation from the Company in 2023. Defendant Brainard is also named as a defendant in the Securities Class Action.

20.     Defendant Derek Adams ("Adams") has served as a member of the Board since

February 2023. Adams also serves as a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee. According to the 2024 Proxy, Adams received $408,593 in compensation from the Company in 2023.

21.     Defendant Jeffrey Bornstein ("Bornstein") has served as a member of the Board since July 2020. Bornstein also currently serves as Chair of the Board's Audit Committee and as a member of the Compensation Committee. According to the 2024 Proxy, Bornstein received $211,780 in compensation from the Company in 2023.

22.     Defendant Malcom Brenner ("Brenner") is a co-founder of the Company and has served as a member of the Board since 2012. Brenner also currently serves as Chair of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy, Brenner received $196,275 in compensation from the Company in 2023.

23.     Defendant David Hallal ("Hallal") has served as a member of the Board since September 2018 and as Executive Chairman since May 2021. Hallal previously served as the Company's CEO and Chairman from September 2018 to May 2021. According to the 2024 Proxy, Hallal received $347,000 in compensation from the Company in 2023. As set forth in the 2024 Proxy, Hallal owned 20,918,982 shares of AlloVir's common stock as of March 31, 2024, equal to 18% of the Company's shares outstanding.

24.     Defendant Morana Jovan-Embiricos ("Jovan-Embiricos") has served as a member of the Board has served as a member of the Board since May 2019. Jovan-Embiricos also currently serves as Chair of the Board's Compensation Committee and as a member of the Audit Committee. According to the 2024 Proxy, Jovan-Embiricos received $209,280 in compensation from the Company in 2023. As set forth in the 2024 Proxy, Jovan-Embiricos owned 26,640554 shares of AlloVir's common stock as of March 31, 2024, equal to 23.17% of the Company's shares

outstanding.

25.     Defendant Sinha has served as the Company's President and CFO and as a member of the Board since January 2019. According to the 2024 Proxy, Sinha received $2,940,669 in compensation from the Company in 2023. As set forth in the 2024 Proxy, Sinha owned 18,284,302 shares of AlloVir's common stock as of March 31, 2024, equal to 15.82% of the Company's shares outstanding. Defendant Sinha is also named as a defendant in the Securities Class Action.

26.     Defendant Shawn Tomasello ("Tomasello") has served as a member of the Board since March 2022. Tomasello also currently serves as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. According to the 2024 Proxy, Tomasello received $200,731 in compensation from the Company in 2023.

27.     Defendant Juan F. Vera ("Vera") is a co-founder of the Company and has served as a member of the Board since January 2014. Vera previously served as the Company's Chief Product Development Officer from January 2014 to June 2020. According to the 2024 Proxy, Vera received $187,000 in compensation from the Company in 2023.

28.     Defendants referenced in paragraphs 19 through 27 are herein referred to as the "Individual Defendants."

29.     The Individual Defendants, together with AlloVir, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers and/or directors of AlloVir, and because of their ability to control the business and corporate affairs of AlloVir, the Individual Defendants owed AlloVir and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AlloVir in a fair, just,

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AlloVir and its shareholders so as to benefit all shareholders equally.

31.     Each director and officer of the Company owes to AlloVir and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AlloVir, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     To discharge their duties, the officers and directors of AlloVir were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of AlloVir, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.     To discharge their duties, the officers and directors of AlloVir were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of AlloVir were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to AlloVir's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AlloVir conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AlloVir and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AlloVir's operations would comply with all applicable laws and AlloVir's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

37.     Each of the Individual Defendants further owed to AlloVir and the shareholders the duty of loyalty requiring that each favor AlloVir's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AlloVir and were at all times acting within the course and scope of such agency.

39.     Because of their advisory, executive, managerial, and directorial positions with

10

AlloVir, each of the Individual Defendants had access to adverse, non-public information about the Company.

40.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AlloVir.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

44.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of AlloVir, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial

11

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of AlloVir and at all times acted within the course and scope of such agency.

## ALLOVIR'S CODE OF CONDUCT

47.     The stated purpose of AlloVir's Code of  Conduct is to "aid the Company's directors, officers and employees in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties."

48.     All directors, officers and employees are be expected to review and sign an acknowledgment regarding the Code of Conduct on a periodic basis. The Code of Conduct further provides that disciplinary measures for violations of the Code of Conduct "may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service, and restitution."

49.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct provides:

> The Company requires that all employees, officers and directors comply with all laws, rules and regulations applicable to the Company wherever it does business. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them.

If you become aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the General Counsel. While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. Employees, officers and directors shall not discharge, demote, suspend, threaten, harass or in any other manner discriminate or retaliate against an employee because he or she reports any such violation, unless it is determined that the report was made with knowledge that it was false. This Code should not be construed to prohibit you from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.

50.     In a section titled "Honest and Ethical Conduct and Fair Dealing," the Code of

Conduct states:

Employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

51.     With respect to "Accuracy of Records," the Code of Conduct states:

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

52.     With respect to "Quality of Public Disclosures," the Code of Conduct provides that

"[i]t is the policy of the Company to provide full, fair, accurate, timely and understandable

disclosure in reports and documents filed with, or submitted to, the Securities and Exchange

Commission and in other public communications."

**ALLOVIR'S AUDIT COMMITTEE CHARTER**

53.     AlloVir's Audit Committee Charter states that the purpose of the Audit Committee

is to:

> (A) assist the Board of Directors (the "Board") in its oversight of (1) the integrity
> of the Company's financial statements, (2) the Company's compliance with legal
> and regulatory requirements, (3) the qualifications, independence and performance
> of the Company's independent auditors engaged for the purpose of preparing or
> issuing an audit report or performing other audit, review or attest services for the
> Company (the "Independent Auditors"), and (4) the performance of the Company's
> internal audit function; and (B) prepare the report required by the rules of the
> Securities and Exchange Commission (the "SEC") to be included in the Company's
> annual proxy statement.

54.     In a section outlining the Audit Committee's responsibilities and authority with

respect to audited financial statements and annual audit, the Audit Committee Charter provides, in

relevant part:

> 1. The Audit Committee shall review the overall audit plan (both internal and
>    external) with the Independent Auditors and the members of management
>    responsible for preparing the Company's financial statements, including the
>    Company's Chief Financial Officer and/or principal accounting officer or
>    principal financial officer (the Chief Financial Officer and such other officer
>    or officers are referred to collectively as the "Senior Accounting
>    Executive").
>
> 2. The Audit Committee shall review and discuss with management (including
>    the Company's Senior Accounting Executive) and with the Independent
>    Auditors the Company's annual audited financial statements, including (a)
>    all critical accounting policies and practices used or to be used by the
>    Company, (b) the Company's disclosures under "Management's Discussion
>    and Analysis of Financial Condition and Results of Operations" before the
>    filing of the Company's Annual Report on Form 10-K, and (c) any
>    significant financial reporting issues that have arisen in connection with the
>    preparation of the audited financial statements.
>
> 3. The Audit Committee must review:
>
>    (i)  any analyses prepared by management, the internal auditors, if any,

14

and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls and any special audit steps taken in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements.

4.  The Audit Committee shall review and discuss with the Independent Auditors (outside of the presence of management) how the Independent Auditors plan to handle their responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the Independent Auditors that Section 10A(b) of the Exchange Act has not been implicated.

5.  Have direct responsibility for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

55.     With respect to the Audit Committee's responsibilities and authority concerning

"Unaudited Quarterly Financial Statements," the Audit Committee Charter states:

The Audit Committee shall discuss with management and the Independent Auditors, before the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

56.     With respect to "Earnings Press Releases," the Audit Committee Charter provides:

The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

57.     With respect to "Risk Assessment and Management," The Audit Committee Charter provides:

1.  The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

2.  In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

## SUBSTANTIVE ALLEGATIONS

### *Materially False and Misleading Statements*

58.     On March 22, 2022, at the start of the Relevant Period, AlloVir issued a press release titled "AlloVir Initiates Global Phase 3 Registrational Study of Posoleucel for Prevention of Life-Threatening Viral Infections from Six Common Viruses in High-Risk, Allogeneic Hematopoietic Cell Transplant Patients." The press release stated, in relevant part:[1]

AlloVir [. . .] today announced the initiation of a Phase 3 registrational study of posoleucel, an allogeneic, off-the-shelf, multi-virus-specific T-cell (VST) therapy, for the prevention of clinically significant infections and end-organ diseases from six potentially life-threatening viruses – adenovirus (AdV), BK virus (BKV), cytomegalovirus (CMV), Epstein-Barr virus (EBV), human herpesvirus-6 (HHV-6) and JC virus (JCV) – in high-risk allogeneic hematopoietic cell transplant (allo-HCT) patients. The global, multi-center, randomized, double-blind, placebo-controlled study will enroll approximately 300 adult and pediatric patients and will evaluate the number of clinically significant infections or episodes of end-organ disease through the primary endpoint of the 14-week dosing interval. Safety and

---

[1] All emphases added unless otherwise indicated.

efficacy will continue to be followed through Week 26.

***Posoleucel has the potential to fundamentally transform the treatment landscape for allo-HCT by preventing life-threatening viral diseases and infections, either as a prophylactic therapy in high-risk patients or as a preemptive therapy in patients who have already reactivated one or more of the six viruses targeted by posoleucel.*** As 90% of allo-HCT patients reactivate at least one of these viruses, there is a large global market opportunity for the prevention of devastating viral diseases, with an estimated addressable patient population of 40,000 allo-HCT patients annually.

\*            \*            \*

"Hematopoietic cell transplantation leaves patients at high risk for multiple viral infections or disease that cause patients significant suffering, prolonged hospitalization, and threaten the graft and patient survival. These viral infections are all too common, with two-thirds reactivating multiple viruses in the first 100 days post-transplantation," said Sanjeet Dadwal, M.D., Chief, Division of Infectious Diseases, and Professor of Medicine, City of Hope, one of the largest cancer research and treatment organizations in the United States, and posoleucel study investigator. "These new data continue to support the potential for posoleucel to prevent infections caused by these six viruses that can lead to significant morbidity and mortality in a vulnerable patient population with limited to no effective treatment options."

***"The clinical data presented at EBMT continue to demonstrate the transformative potential of posoleucel, a multi-virus-specific T-cell therapy, for immunocompromised patients," said Brainard[.] "We now have three ongoing Phase 3 studies of posoleucel in both the prevention and treatment of life-threatening viral infections with limited or no treatment options. We are working urgently on advancing our three global, registrational trials for posoleucel to bring this important therapy to children and adults who are at risk for or suffer from these devastating viral diseases."***

59.    On April 20, 2022, the Company issued a press release entitled "FDA Grants Regenerative Medicine Advanced Therapy (RMAT) Designation to AlloVir's Posoleucel for Prevention of Multiple Life-Threatening Infections from Six Viruses in Allogeneic Hematopoietic Cell Transplant Patients." The press release stated, in relevant part:

AlloVir [. . .] today announced that the U.S. Food and Drug Administration (FDA) has granted Regenerative Medicine Advanced Therapy (RMAT) designation to its lead investigational multi-virus-specific T cell therapy, posoleucel, for the prevention of clinically significant infections and disease from six devastating

viruses that commonly impact high-risk adult and pediatric patients following allogeneic hematopoietic cell transplant (allo-HCT) – adenovirus (AdV), BK virus (BKV), cytomegalovirus (CMV), Epstein-Barr virus (EBV), human herpes virus-6 (HHV-6) and JC virus (JCV). This is the third RMAT designation that FDA has granted to posoleucel, in recognition of the therapy's transformative potential to address significant unmet medical needs facing immunocompromised allo-HCT patients.

*          *          *

"The receipt of three RMAT designations for a single therapy is unprecedented. Posoleucel's three RMAT designations reflect the strength of AlloVir's multi-virus platform and its potential both to deliver an important treatment option for immunocompromised patients who currently have none, and to transform the management of allo-HCT patients with a multi-virus prevention approach," said Ercem Atillasoy, M.D., Chief Regulatory and Safety Officer, AlloVir.

60.     On May 5, 2022, the Company issued a press release reporting AlloVir's first quarter 2021 financial results. The press release stated, in relevant part:

"We are focused on rapidly advancing our lead product candidate, posoleucel, with the aim of delivering this potentially transformative therapy to patients in need as quickly as possible. Based on the strength of our Phase 2 data in both treatment and prevention, we now have three Phase 3 studies underway that aim to address a spectrum of needs in the post-allo-HCT setting – as a treatment for patients already suffering the devastating impact of viral infections and disease, as a preemptive therapy for patients who have reactivated one or more viruses, and as a prophylactic therapy in high-risk patients without viremia," said [Defendant] Brainard[.] "The multi-virus prevention approach is the most transformative use of posoleucel and, accordingly, we are seeing strong enthusiasm from hematologists and infectious disease specialists as we expand our Phase 3 study sites and enrollment."

61.     Also on May 5, 2022, AlloVir filed a quarterly report on Form 10-Q with the SEC (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendants Brainard and Sinha, who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the Q1 2022 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company."

62.     The Q1 2022 10-Q stated, in relevant part:

AlloVir, Inc. ("AlloVir" or "the Company", formerly known as ViraCyte, Inc.) is a

leading late clinical-stage cell therapy company developing highly innovative allogeneic T-cell therapies to treat and prevent devastating viral diseases. The Company's innovative and proprietary virus-specific T-cell, or VST, therapy platform allows AlloVir to generate off-the-shelf VSTs designed to restore immunity in patients with T-cell deficiencies who are at risk from the life-threatening consequences of viral diseases. There is an urgent medical need for therapies to treat a large number of patients suffering from viral diseases who currently have limited or no treatment options. The Company is developing four innovative, allogeneic, off-the-shelf VST therapy candidates targeting 12 different devastating viruses. The Company's lead product, posoleucel (previously referred to as Viralym-M or ALVR105), is a multi-VST-cell therapy that targets six viruses: adenovirus, or AdV, BK virus, or BKV, cytomegalovirus, or CMV, Epstein-Barr virus, or EBV, human herpesvirus 6, or HHV-6 and JC virus, or JCV. The Company believes that posoleucel has the potential to fundamentally transform the treatment landscape for transplant patients by substantially reducing or preventing disease morbidity and mortality, thereby dramatically improving patient outcomes.

To fully explore the clinical benefit of posoleucel, the Company is conducting three Phase 3 pivotal and two Phase 2 proof-of-concept, or POC, trials in 2022 for the treatment and prevention of life-threatening viral diseases in pediatric and/or adult allogeneic hematopoietic cell transplant, or HCT, patients, each representing a potential meaningful commercial opportunity. The three ongoing pivotal trials evaluate the efficacy and safety of posoleucel for the treatment of virus-associated hemorrhagic cystitis, or HC, for the treatment of AdV infections and for the prevention of infections and disease caused by posoleucel's six target viruses, respectively. A POC clinical trial for multi-virus prevention in HCT has completed enrollment and final data are expected by year-end. A second POC trial evaluating posoleucel for BKV treatment in kidney transplant is ongoing. The BKV trial is the first posoleucel study in solid organ transplant patients.

63.     On August 4, 2022, AlloVir issued a press release announcing the Company's

second quarter 2022 financial results. The press release stated, in relevant part:

"In the first half of 2022, AlloVir made great progress advancing our pipeline of off-the-shelf, multi-virus specific T cell therapies, especially with our lead candidate, posoleucel. The preliminary Phase 2 multi-virus prevention data have strengthened awareness of the transformational potential of posoleucel as preemptive or prophylactic therapy for viral infections post allo-HCT and have facilitated engagement in our Phase 3 program with leading international transplant centers," said Brainard[.] "In addition, we are excited to have the strong support of our investors who recently provided additional capital to enable the completion, data readouts and global regulatory submissions for all three ongoing Phase 3 registrational trials of posoleucel. We believe their investment demonstrates a strong affirmation of our science and ability to execute our plans to deliver this potentially transformative therapy to immunocompromised patients in need."

*Recent Highlights*

- The Phase 3 study of posoleucel for the prevention of clinically significant infections and end-organ disease from posoleucel's six target viruses in high-risk allo-HCT patients, continued to expand globally in the second quarter of this year, with patients enrolling in the U.S., Europe and Asia. The multi-virus prevention study evaluates the use of posoleucel either as prophylactic therapy in patients without viremia or preemptive therapy for patients who have reactivated one or more of the target viruses. Multi-virus prevention has the potential to transform the management of transplant patients, who currently have limited to no approved treatment options for these devastating infections that threaten patient survival.

64.     Also on August 4, 2022, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q2 2022 10-Q"). The was signed by Defendants Brainard and Sinha, who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the Q2 2022 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company." The Q2 2022 10-Q contained substantively similar statements concerning the Company as the Q1 2022 10-Q detailed above.

65.     On November 3, 2022, the Company issued a press release announcing third quarter 2022 financial results. The press release stated, in relevant part:

"We are focused on rapidly advancing the ongoing posoleucel Phase 3 registrational trials, with the goal of delivering a significant clinical advance for allo-HCT patients who currently have very limited therapeutic and preventive options for these common, yet devastating and potentially life-threatening, viral infections and diseases," said Brainard[.] "We are particularly excited to report final data before year-end from the Phase 2 multi-virus prevention study, where preliminary results supported the acceleration of our global Phase 3 study for this potential indication. Preventing clinically significant viral infections and diseases after allo-HCT represents the most transformative use of posoleucel."

*                *                *

*Recent Highlights*

- The Phase 3 study of posoleucel for the prevention of clinically significant infections and end-organ disease from posoleucel's six target viruses in high-risk allo-HCT patients, continued to expand, with ongoing patient

enrollment in the U.S., Europe and Asia. The multi-virus prevention study evaluates the use of posoleucel either as prophylactic therapy in patients without viremia or preemptive therapy for patients who have reactivated one or more of the target viruses: adenovirus (AdV), BK virus (BKV), cytomegalovirus (CMV), Epstein-Barr virus (EBV), human herpes virus-6 (HHV-6) and JC virus (JCV). ***Multi-virus prevention has the potential to transform the management of allo-HCT patients, who currently have limited to no approved treatment or prevention options for these devastating infections that threaten patient survival.***

66.     Also on November 3, 2022, AlloVir filed a quarterly report on Form 10-Q with the SEC (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendants Brainard and Sinha, who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the Q3 2022 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company." The Q3 2022 10-Q contained substantively similar statements concerning the Company as the Q1 2022 10-Q and Q2 2022 10-Q as detailed above.

67.     On January 9, 2023, the Company issued a press release entitled "AlloVir Announces Plans to Complete Enrollment in Three Phase 3 Posoleucel Studies in 2023." The press release quoted Defendant Brainard, stating, in relevant part:

> ***"The positive posoleucel Phase 2 data we reported in 2022 and the enthusiasm we are seeing from transplant centers give us further confidence in our Phase 3 strategy for posoleucel and our ability to execute on our trials in 2023,"*** said Brainard. "Our Phase 2 multi-virus prevention study data underscore the potential for posoleucel to be transformative for allo-HCT patients by substantially reducing clinically significant infections from six viruses that are devastating for this vulnerable population. Viral infections are a leading cause of non-relapse mortality, generate substantial healthcare expenditures, exact a significant emotional burden on patients and their caregivers, and unfortunately most viruses targeted by posoleucel currently have no preventive therapies."

68.     On February 15, 2023, AlloVir issued a press release announcing the Company's full year 2023 financial results and 2023 outlook. The press release stated, in relevant part:

> "With the acceleration of the posoleucel multi-virus prevention study and continued enrollment in the viral hemorrhagic cystitis and adenovirus treatment Phase 3 studies in 2022, the posoleucel franchise is positioned for potentially significant

value creation over the next 12-24 months," said Brainard[.] "During 2023, we plan to complete enrollment in our Phase 3 registrational studies, which would enable data readouts in 2024 and, with positive results, regulatory filings and acceleration of commercial preparations to follow."

Brainard continued, "Today we also announced positive final Phase 2 results from our first study of posoleucel in the solid organ transplant setting, showing balanced safety across the posoleucel and placebo groups and clinically meaningful greater viral load declines with posoleucel versus placebo in kidney transplant patients with BKV. These results are important proof of concept for the use of posoleucel in the solid organ transplant setting. We look forward to working with regulatory authorities and transplant specialists on our future clinical development plans for this patient population with high unmet medical need."

69.    Also on February 15, 2023, the Company filed an annual report on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Brainard, Sinha, Hallal, Bornstein, Brenner, Jovan-Embiricos, Tomasello, and Vera. Defendants Brainard and Sinha also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the 2022 10-K "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]"

70.    The 2022 10-K stated, in relevant part:

If approved, we believe posoleucel has a large global market opportunity to treat and prevent devastating viral diseases. Based on the established epidemiology of our target Phase 3 indications, we estimate the addressable patient population for posoleucel will be approximately 41,000 HCT patients annually in 2025. The addressable patient population could expand beyond HCT patients into SOT patients as well as beyond the transplant setting to additional immunocompromised patients suffering from these devastating viral infections.

*              *              *

Our management team has significant experience in successfully advancing products from early-stage discovery through commercialization. Our Chief Executive Officer, [Defendant] Brainard, has more than 20 years of experience in the biopharmaceutical industry and academic medicine.

71.    With respect to the Company's pipeline, the 2022 10-K stated, in relevant part:

- Posoleucel. An allogeneic, off-the-shelf VST therapy candidate targeting six common viruses: AdV, BKV, CMV, EBV, HHV-6 and JCV, which can lead to devastating viral disease in the allogeneic HCT population. Given that posoleucel is multi-VST product candidate, the therapy has multiple potential applications. To this end, three Phase 3 registrational trials are ongoing– one for the treatment of virus-associated HC, one for the treatment of adenovirus infection and one for multi-virus prevention, all in HCT patients. All three Phase 3 trials are expected to complete enrollment in 2023, potentially enabling data readouts in 2024. Promising efficacy and safety results from the completed Phase 2 treatment and prevention trials in allogeneic HCT patients enabled the rapid progression of posoleucel into Phase 3 development. In the CHARMS Phase 2 POC treatment trial, 95% of allogeneic HCT patients with infections from one or more of the target viruses and who previously failed or were intolerant to conventional antiviral treatments, achieved a clinical response when treated with posoleucel therapy. In the Phase 2 multi-virus prevention trial, posoleucel demonstrated a substantial reduction in the expected rate of clinically significant viral infections or diseases, with 88% of patients remained free of clinically significant infections caused by any of the six viruses that posoleucel targets through the Week 14 primary endpoint.

72.    With respect to the Company's strategy, the 2022 10-K provided, in relevant part:

Our goal is to extend our leadership position in the development of allogeneic, off-the-shelf VST-cell therapies to serve patients at risk of the life-threatening consequences of severe viral diseases. To achieve this, we are pursuing the following strategies:

- ***Accelerate the completion of posoleucel registrational trials for three indications with no FDA-or EMA-approved or effective treatment options***. By targeting six devastating viral pathogens, we believe that posoleucel has the potential to fundamentally transform the care of HCT and SOT patients, as well as other individuals at high risk for opportunistic viral infections, by substantially reducing or preventing disease morbidity and dramatically improving patient outcomes. We have three ongoing Phase 3 trials of posoleucel – one for the treatment of virus-associated HC, one for the treatment of AdV infections, and one for multi-virus prevention – all in allogeneic HCT patients. These trials offer the fastest path to deliver posoleucel to patients in need, with the prevention indication offering the most transformative potential for the management of allogeneic HCT patients. We have successfully accelerated the multi-prevention study in recognition of this fact.

73.    With respect to the Company's commercialization plans for posoluecel, the 2022 10-K stated, in relevant part:

23

If approved, we intend to commercialize our highly innovative off-the-shelf VST therapies globally to serve a large number of patients suffering from the life-threatening consequences of viral diseases. Initially, to launch our late clinical stage therapies for the treatment of transplant patients, we will establish a focused commercial infrastructure targeting high-volume transplant centers globally. Based on the relatively small number of transplant centers that perform the majority of these transplant procedures, we believe that the entire target market for our VST therapies could be served by a small global team. In the US, there are approximately 185 stem cell transplant centers, of which the top 70 centers perform 80% of the allogeneic HCT, and in the five major European countries (Germany, France, UK, Italy, Spain) there are approximately 410 stem cell transplant centers, of which the top 129 centers perform 80% of allogeneic HCT. Furthermore, in the U.S. there are approximately 240 centers performing kidney transplants, of which the top 100 centers perform 80% of the transplants. We believe that many of these same transplant centers will also have participated in our pivotal and proof-of-concept trials for posoleucel and ALVR106 and will have significant experience with our investigational VSTs, which will support commercial launch and adoption of our therapies. As we eventually progress to serve non-transplant patients at high-risk for the life-threatening consequences of viral diseases, we will expand our global commercial capabilities.

Our team has extensive experience launching and commercializing specialty pharmaceuticals globally with a strong track record of achieving broad patient access resulting in industry leading product launches. By targeting severe viral diseases that result in prolonged hospitalization, multi-organ disease and failure and increased risk of death, and currently have limited or no treatment options, we believe that our therapies have the potential to transform the lives and care of patients globally.

74.    On May 4, 2023, the Company issued a press release announcing financial results from the first quarter 2023. The press release stated, in relevant part:

"We continue to focus our efforts on rapidly advancing the three global Phase 3 ongoing registrational trials evaluating our lead investigational product, posoleucel, for the prevention and treatment of common, yet devastating, and potentially life-threatening viral infections and diseases in allo-HCT patients where significant unmet need persists," said Brainard[.] "In tandem, we reported final positive results from the Phase 2 study of posoleucel for the treatment of BKV, the first demonstration of its safety and antiviral effect in solid organ transplant recipients. We continue to be encouraged by the potential of posoleucel as a transformative therapeutic for transplant patients."

75.    Also on May 4, 2023, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendants Brainard and Sinha,

who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the Q1 2023 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company." The Q1 2023 10-Q contained substantively similar statements concerning the Company as the Q1 2022 10-Q as detailed above.

76.     On August 3, 2023, the Company issued a press release announcing financial results from the second quarter 2023. The press release stated, in relevant part:

> "We are excited to be advancing our company's three Phase 3 global registrational trials of posoleucel for three indications that threaten allo-HCT recipients. Treating and preventing life-threatening viral infections using T cells that focus on restoring natural immunity addresses a significant unmet need for allo-HCT patients, which could have a significant impact on patient outcomes, morbidity, and survival," said Brainard[.] "We are very pleased with our progress to date and are on track to report data from all three studies in the second half of 2024."

77.     Also on August 3, 2023, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendants Brainard and Sinha, who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the Q2 2023 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company." The Q2 2023 10-Q contained substantively similar statements concerning the Company as the Q1 2022 10-Q as detailed above.

78.     On November 2, 2023, AlloVir issued a press release announcing the Company's financial results from the third quarter 2023. The press release stated, in relevant part:

> "At AlloVir, we are dedicated to serving immunocompromised patients suffering from devastating and life-threatening viral diseases," said Brainard[.] "We are working with urgency to complete enrollment in our three global Phase 3 pivotal trials of posoleucel to deliver this potentially transformative therapy to patients that can benefit from the prevention and treatment of viral diseases with limited to no approved or effective therapies today. We expect a catalyst rich next 12 months with clinical and regulatory milestones and continued commercial preparations in advance of a potential 2025 launch."

79.     Also on November 2, 2023, the Company filed a quarterly report on Form 10-Q

with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants Brainard and

Sinha, who also provided certification pursuant to the Sarbanes-Oxley Act of 2002 that the

information contained in the Q3 2023 10-Q "fairly presents, in all material respects, the financial

condition and result of operations of the Company." The Q3 2023 10-Q contained substantively

similar statements concerning the Company as the Q1 2022 10-Q as detailed above.

80.    The statements detailed above were false and misleading when made, and omitted

material facts about the Company's business, operations, and prospects. Specifically, the

Individual Defendants made or caused the Company to make false and misleading statements, and

omitted material facts, in that: (a) the posoleucel Phase 3 Studies were unlikely to meet their

primary endpoints; (b) as a result, it was likely that the Company would ultimately discontinue the

posoleucel Phase 3 studies; and (c) accordingly, AlloVir overstated the efficacy and clinical and/or

commercial prospects of posoleucel. As a result, the Individual Defendants caused the Company's

public statements to be materially false and misleading at all relevant times.

### The Truth Emerges

81.    The truth emerged on December 22, 2023, when the Company issued a press release

titled "AlloVir Provides Updates on Phase 3 Clinical Development Program for Posoleucel, an

Allogeneic Virus-Specific T Cell Therapy." The press release stated, in relevant part:

> AlloVir [. . .] today provided an update on its three Phase 3 clinical trials with
> posoleucel, an investigational off-the-shelf multi-virus-specific T cell therapy,
> which targets six viral pathogens in immunocompromised individuals: adenovirus
> (AdV), BK virus (BKV), cytomegalovirus (CMV), Epstein-Barr virus (EBV),
> human herpesvirus-6 (HHV-6) and JC virus (JCV). The company will discontinue
> its three global Phase 3 posoleucel studies – for prevention of clinically significant
> infections or diseases by multiple viruses, treatment of virus-associated
> hemorrhagic cystitis (vHC), and treatment of adenovirus (AdV) – following
> allogeneic hematopoietic cell transplant (allo-HCT). The company made the
> determination following three pre-planned analyses by three independent Data
> Safety Monitoring Boards (DSMBs) each of which recommended stopping its

respective trial for futility after a review of the data suggested that each study was unlikely to meet its primary endpoint. There were no observed safety concerns raised by any of the DSMBs.

AlloVir is in the process of notifying regulatory agencies and clinical trial investigators involved in these trials of the findings.

"While we are disappointed by the unexpected outcome of these trials, we are encouraged by the apparent safety profile of posoleucel," said [Defendant] Brainard [.] "In light of the DSMB recommendations, we will discontinue the prevention, vHC and AdV Phase 3 trials. We will continue to analyze the data from these studies to understand any variables that may have impacted outcomes or any apparent subpopulation benefits. We thank the patients, investigators and staff who participated in the trials."

Brainard continued, "We established pre-planned futility analyses across these three Phase 3 trials, as each assessed a potentially highly innovative treatment for patients suffering with severe and complex medical conditions lacking significant prior clinical development, and we also expected the trials would require substantial additional capital to bring them to completion. With these current results, we will immediately shift our focus to preserve our substantial remaining capital, review our pipeline and assess strategic options."

AlloVir will review strategic alternatives for the Company and its portfolio of virus-specific T cell therapies. Such alternatives may include a merger, sale, divestiture of assets, licensing, or other strategic transaction. As of September 30, 2023, AlloVir had cash, cash equivalents and short-term investments of $213.3 million.

82.     Following this news, AlloVir's stock price fell $1.57 per share, or 67.38%, to close at $0.76 per share on December 22, 2023.

***Harm to the Company***

83.     As a direct and proximate result of the Individual Defendants' misconduct, AlloVir has lost and expended, and will lose and expend, millions of dollars.

84.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

85.     Such expenditures also include, but are not limited to, the cost of implementing

measures to remediate the material weaknesses in the Company's internal control over financial reporting.

86.     Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

87.     As a direct and proximate result of the Individual Defendants' conduct, AlloVir has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

88.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

89.     AlloVir is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

90.     Plaintiff is an owner of AlloVir common stock and has been a continuous shareholder of Company stock at all relevant times.

91.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

92.     A pre-suit demand on the Board of AlloVir is futile and, therefore, excused. At the time this action was commenced, the nine-member Board consisted of Individual Defendants

Brainard, Adams, Bornstein, Brenner, Hallal, Jovan-Embiricos, Sinha, Tomasello, and Vera (the "Director Defendants"). As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

93.     The acts complained of herein constitute violations of fiduciary duties owed by AlloVir's officers and directors, and these acts are incapable of ratification.

94.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

95.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

96.     Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

97.     Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

98.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

99.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

100.     Defendants Bornstein, Jovan-Embiricos, and Tomasello (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above, and ensure that proper firewall procedures were in place. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

101.     Further, the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the

Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

### COUNT I

#### Against The Individual Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

106.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of AlloVir were materially false and

31

misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

107.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of AlloVir, their control over, and/or receipt and/or modification of AlloVir's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning AlloVir, participated in the fraudulent scheme alleged herein.

108.    As a result of the foregoing, the market price of AlloVir common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of AlloVir common stock in purchasing AlloVir common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

109.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    The Individual Defendants owe the Company fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

112.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

113.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, in that: (a) the posoleucel Phase 3 Studies were unlikely to meet their primary endpoints; (b) as a result, it was likely that the Company would ultimately discontinue the posoleucel Phase 3 studies; and (c) accordingly, AlloVir overstated the efficacy and clinical and/or commercial prospects of posoleucel. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

115.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and

omissions of material fact referenced herein.

116.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

117.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

118.    Plaintiff, on behalf of AlloVir, has no adequate remedy at law.

### COUNT III

**Against The Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

121.    Plaintiff on behalf of AlloVir, has no adequate remedy at law.

**COUNT IV**

**Against The Individual Defendants for Unjust Enrichment**

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AlloVir.

124.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from AlloVir that was tied to the performance or artificially inflated valuation of AlloVir or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

125.    Plaintiff, as a shareholder and a representative of AlloVir, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

126.    Plaintiff, on behalf of AlloVir, has no adequate remedy at law.

**COUNT V**

**Against The Individual Defendants For Waste Of Corporate Assets**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by

allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

129.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

130.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

131.   Plaintiff, on behalf AlloVir, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of AlloVir and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.   Directing AlloVir to take all necessary actions to reform and improve its corporate governance and internal procedures to protect AlloVir and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into

the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 3, 2024

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
tjm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

**MATORIN LAW OFFICE, LLC**

By: */s Mitchell J. Matorin*
Mitchell J. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlawoffice.com

*Attorneys for Plaintiff*